Marvin Green
220 PINCKNEY ST APT B
SAN ANTONIO TX 78209-6904
marvin.e.green@us.army.mil
C 210-389-6231, H 210-824-0959

In The

# District Court of the United States – District of Columbia



|  |  |
|---|---|
| ) | Case No. <u>06-1434 RBW</u> |
| ) | |
| MARVIN GREEN for SG, )| MOTION FOR TEMPORARY |
| Plaintiff, )| RESTRAINING ORDER LIFTING |
| v. )| BARMENT ORDER AND PROVIDING |
| )| EVIDENCE OF JURISDICTION AND |
| Capt. Stuyvesant, )| REQUEST A FINDING OR ORDER |
| Defendant. )| FOR SG AS TO HIS STUDENT |
| )| RESEDENCY REQIREMENTS |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | Date: January 14 2007 |
| ) | |

## I. <u>INTRODUCTION</u>

Plaintiff will expand on the most recent argument submitted in 06-1008RBW relating to the State Dept (which resides within this courts jurisdiction). Plaintiff will demonstrate that for the period starting in March 27, 2003 until November 5, 2006 Plaintiff was more properly a resident of the District of Columbia than any other of the United States. In addition, and since this case is primarily concerned with the rights of SG – I request a

finding or order on SG's behalf that SG retains or may elect his California residency status independently from his parents.

## II. STATEMENT OF FACTS

On or about April of 1994, SG and his parents departed California as a family unit destined to Okinawa where Plaintiff (as head of household) had accepted a contractor IT position working for DoDDS-Pacific. We were met at the Naha airport by Jim Jesse who was initially my temporary supervisor, friend and co-worker, both of us joining the government, he as a GS 11 and I as GS 12. Jim is currently a State Dept. IT Foreign Service Specialist in Seoul Korea and my primary reference for a similar position. (These initial GS rating and Jim as a potential witness are important to case 06-1141 as I am contending in that case that the positions that we took in Europe at GS12 were an intra-agency personnel raid that forced up costs in Europe and resulted in the necessity of an A76 study that could have been avoided by better cost controls by DoDEA headquarters in 1997. When Jim was assigned to DoDEA headquarters as a GS13 I understand that he was part of, or in charge of, an MEO (most efficient organization) effort that would have resulted in an employee bid for DoDEA IT services world-wide. The failure of this bid supports my contention that Dr. Tafoya and the DoDEA Arlington "Headquarter" do not control the DoDDS-P or DoDDS-E entities in any meaningful way and that these two entities are in fact controlled by local military commanders in each theater. At the risk of putting an argument in the wrong place – venue change to Arlington should be denied because

DoDEA failed in 1997 to demonstrate control of DoDDS-E and if case 06-1141 was sealed and sent to DoDEA for investigation then I contend that the court has sufficient proof in hand as to DoDEA's impotence in the affairs of DoDDS-E.)

On or about January of 1995 I filed a California state income tax return. Last one. I did it because as a contractor I thought I might need the unemployment insurance, but since joining the government in Jan 8 1996 I have known I would not be returning to California because of the lack of return rights and the known PPP program parameters.

Well before the 2000 general election, in my consultation with Sigonella Navy legal office lawyer Hairston, in addition to asking if I could force Sophia to move with me, I also asked him how to establish my legal residence in a state other than California. He advised me that there were a number of ways to establish extra-California residency such as registering to vote, drivers license, buying property and paying a utility bill in another state for a year.

Well before the 2000 general election, I registered to vote in Dade County Florida and had the honor of voting for George Bush in the 2000 election as an absentee voter from Florida – hanging chads and all. (Rhetorical question: how many of the conservative absentee voters were registered in Florida simply because it was state income tax free?)

In July 2005 Plaintiff obtained a Florida state drivers license. On this same trip Sophia renewed her California license and registered to vote in

California – thus establishing her "intent to return". This is the same RAT

trip that DoDDS-E has refused to pay for in case 06-1009.

On or about January 2006 Sophia and I filed a joint Federal tax return

and Sophia, ably assisted by Sigonella Base tax preparation sailors, filed a

California state tax return as head of household – thus qualifying SG for

California in-state tuition rates and federal and state financial aid on the

basis of her income alone.

In March 2006 Plaintiff registered in PPP and selected the southern

area thus insuring I would not be going back to California.

On March 21 2006 Sophia attempts to pursue the appeal process for her

Implied Consent conviction but receives no reply from her Sigonella base

lawyer, Paige Ormiston. Plaintiff contends that Sophia followed her

administrative remedies to the fullest extent possible and so:

In March of 2006 Sophia initiated a complaint with Congressman

Waxman's office without Plaintiff's foreknowledge but with Plaintiffs

assistance once it became inevitable.

On March 31 2006 Congressman Waxman's office acknowledged receipt

of the complaint and initiated a subsequent inquiry, which Captain

Stuyvesant claimed on July 5 2006 to have not heard of. If this is true then at

the very least this base has an internal communication problem.

In June 2006 Captain Stuyvesant barred Sophia from her job thereby

reducing her 2006 income below the requisite 50% threshold to qualify her as

a head-of-household under California state income tax law. SG will now be forced to list my income thus disqualifying SG for both federal and state grants. Captain Stuyvesant, by barring SGs parent Sophia from the Navy base in Sigonella has changed SG's loan/grant ratio to where ultimately SG may have to pay back up to $80,000 in student loans for his education.

On or about the 1st week in July 2006 Plaintiff and SG approached a Santa Barbara Sherriff's station stating the intent of filing child endangerment charges against Captain Stuyvesant. The Sherriff's Deputy directed Plaintiff and SG to the Naval base at Port Henueme.

On or about mid to late July 2006 SGs parents went to Rome to apply for a Hungarian passport and dual citizenship for Sophia in order to regain access to the base as a European Union local national (and thereby eligible for the Soggorno which the Captain has specifically directed the SJA to prevent her from getting by threat of deportation when she showed up to apply).

On September 7 2006 Plaintiff notified supervisor Harrison and Sutton of errors in the PPP program and their likely placement in or near the District of Columbia. Plaintiff believes this letter may be used by DoDEA because:

On September 7 2006 Jeff Sutton went out of office from Thursday thru Wednesday. (Speculation: was he required to make a report because of one of my cases? Did he require some statement from me so as to claim I had been

asked for my side? Do the 5 days imply he went to DoDEA headquarters? Did

case 06-1141 go to DoDEA headquarters where they did a perfunctory

investigation and now they are going to just wait me out?)

On November 5, 2006 Plaintiff took up residence in Texas.

On or about mid December 2006, just before I went back to Sicily for

Christmas (December 20 2006), I received a forwarded letter dated October

13 2006 that indicated I had qualified for the State Department IT position,

(with an 18 month count down to oblivion judging by their lack of interest in

my updated contact information and address). This letter along with all of my

other State Dept application process, (interview, medical checks, security

clearance), have all occurred within or related to the District of Columbia and

the Dept of State organizations therein, and demonstrate that Plaintiff was

more involved in District of Columbia matters, from mid 2003 until Nov 06,

than being involved in or attached to any other state.

On January 13, 2007 SG relayed to Plaintiff his intent to change majors

from communications to law. They do listen. Belatedly.

### III. ARGUMENTS

When Plaintiff accepted government employment in the overseas area,

without return rights to a specific government job in a specific State; and by

virtue of the known to Plaintiff characteristics of the PPP program – Plaintiff

has had no way of knowing which State Plaintiff would ultimately be

assigned to. Plaintiff took steps to specifically exclude California from the

PPP list. In addition when the Santa Barbara County Sherriff's Deputy declined Plaintiff's complaint he declined venue on behalf of California. This declination was in line with Plaintiff's needs and expectations but may not have been in SG's or his mothers best interests as they have both indicated an intent to return there, (in July of 2007 for SG, and eventually in Sophia's case). Argument of venue change to California is insufficient unless and until SG reaches his majority and/or until a relative funds legal services for him.

Venue to Florida has some justification as SG has cousins, aunts and uncles there but now that Plaintiff has taken up residence in Texas and SG has ruled out University of Miami – there is insufficient rationale to support change of venue or jurisdiction to Florida.

By virtue of the PPP program's random assignments and the District of Columbia being a more likely result statistically because of the concentration of Federal Employees, and more importantly by virtue of Plaintiff's successful qualification for State Department employment – Plaintiff, as SGs only coherent voice, was more a resident of the District of Columbia (from March 27 2003 until November 5 2006) than a resident of any other of the United States their territories or district(s).

An even more compelling argument for DC venue is that the State Department has declined my contact information and has declined to implement the executive order requiring reciprocity of Security Clearance Investigations between executive agencies, namely State and Army, and so

have become a party to related case 06-1008. First I will extract that Security

Clearance Investigation from their cold lifeless fingers and in so doing find

out if there is any hope of them actually hiring me, or I will find that rigor

mortis has set in on my chances and that I have nothing left to lose but to

add them as a defendant party – moderately unwitting yet willing

participants after the fact in discrimination, much like the good Captain.

 This, combined with my related arguments in case 06-1008 concludes

my venue arguments, hopefully for all 4 cases. If the court is inclined toward

venue change in any of the 4 related cases this Plaintiff requests the

opportunity to argue for Plaintiff's second choice namely to the Federal Court

in San Antonio.

 While on the subject of State residency requirements, Plaintiff requests

a finding or ruling on SGs behalf. SG left California at the age of 5

accompanied by Plaintiff who was conducting Federal Business on behalf of

all 50 United States their territories and this court's district. SG was born in

California, has most of his relatives in California and has generally expressed

a preference to return to that State from whence he came. SG will attain his

majority in May 2007 and will graduate in June 2007. Plaintiff requests a

ruling that SG has the independent right to elect California State Citizenship

upon attaining his 18th birthday and is exempt from the one year State

Residency Requirement for purposes of student in-state tuition rates.

Plaintiff makes a second request on SGs behalf. That the Sigonella

Naval Base be ordered to pay Sophia $12,000 in lost income for 2006 thus

enabling her to qualify as a California Head of Household thus allowing SG

to apply for student financial aid utilizing her income solely.

IV. <u>CONCLUSION</u>

Sophia just called me and relayed that SG had just had another grand

mal seizure, while she was out picking up McDonalds for him. He sustained a

cut to his nose and foot and possibly another blow to the head. While I was

there for Christmas I not only suggested he would make a good lawyer but

that he come to San Antonio for a few months before going on to school in

California - possibly even taking a semester of classes at a local college while

becoming acclimated to American culture and a local bus system. (After

seeing the fine metro system in D.C. I made the decision to go car-less, and

have done so here in San Antonio since November. I'm also setting an

example for SG that it is possible to be a man without a drivers license,

(while simultaneously joining the tiniest minority in Texas – a Republican at

a bus stop...)).

If SG accedes to my wishes he will lose his California residency that

flows from his mother's established "intent to return". SG will reach his

majority outside of the U.S. He will graduate from a government funded

school, having been placed there by virtue of Federal business.

As case law I am requesting an order exempting SG from the 1 year residency requirements in both California and Texas based on the reasons above and his unique circumstances.

As case law, or possibly legislation for Congressman Waxman to propose, I am requesting that all students graduating from government funded schools, (State and DoD vouchered schools included), outside of the United States it's Territories and District be exempt from Student Residency Requirements in any of the United States, Territories & District between their 18th and up until their 24th birthdays. (Everybody wins. They are going to school somewhere – so there is no significant cost increase to the states, and the present system of state requirements is an encumbrance of/to Federal business.)

Plaintiff has made a reasonable case for this courts jurisdiction and venue. Defendant's have conceded the issue by haughtily proposing dismissal without even hedging with a proposed venue change? Not sure, but Plaintiff requests that the court accept jurisdiction of this and the 3 related cases. And please lift the barment order so that this can become a semi-pleasant intellectual joust as apposed to the present life or death situation. (Explanation: SG and Sophia believe that since SG has never been taken off the official banning order and the Sigonella hospital is trying to discharge him - that the Captain may be planning to implement the barment order upon him at the semester break later this month. This acts as a "sword of

damocles" over him, stressing him into more frequent seizures – the barment

order has to go now – for SGs welfare.)

Date: January 14, 2007

/s/ Marvin E. Green